UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRIAN PETTY                      )
                                       )
v.                                 )       No. 3:05-0680
                                       )       JUDGE CAMPBELL
METROPOLITAN GOVERNMENT OF    )
NASHVILLE-DAVIDSON              )

MEMORANDUM

I.  Introduction

Pending before the Court are Plaintiff's Motion For Summary Judgment (Docket No. 22), and The Metropolitan Government's Cross-Motion for Summary Judgment (Docket No. 30). For the reasons set forth below, Defendant's Motion is GRANTED in part, and DENIED in part. Plaintiff's Motion is DENIED.

Specifically, the Court holds that Defendant is entitled to summary judgment on the following claims: (1) failure to promptly reemploy the Plaintiff; (2) failure to return Plaintiff to a patrol position during the pendency of the second investigation; and (3) retaliation. Plaintiff's discrimination claim regarding refusal to approve off-duty work remains for trial.

The Court hereby orders the parties to participate in alternative dispute resolution, pursuant to Rules 16.02 -16.08 of the Local Rules of Court. The Magistrate Judge shall issue all necessary orders to implement the type of alternative dispute resolution he selects as appropriate.

II.  Factual and Procedural Background

Plaintiff Brian Petty brought this action against Defendant Metropolitan Government Of Nashville and Davidson County, Tennessee, alleging that the Metropolitan Police Department

violated the Uniformed Services Employment and Reemployment Rights Act of 1994

("USERRA"), 38 U.S.C. §§ 4301-4334, by failing to reemploy him in accordance with the Act

after his return from active duty with the United States Army. (Amended Complaint (Docket No.

15)).

The parties agree to the following facts: Plaintiff joined the Army National guard in 1986

and opted into the Army Reserve with the Army National Guard as his "reserve component" in

1989. (Defendant's Response To Plaintiff's Statement of Undisputed Material Facts, at ¶ 1

(Docket No. 32)(hereinafter "Defendant's Response To Facts")). The Defendant hired the

Plaintiff as a police officer on February 1, 1991. (Id., at ¶ 2). In 1993, Metro assigned the

Plaintiff to patrol the West sector of Nashville, where Plaintiff focused on crime prevention in

housing projects. (Id., at ¶ 3). Metro promoted the Plaintiff to the rank of sergeant in January,

2000, whereupon he started supervising other officers in the South sector. (Id., at ¶ 4). After

various reassignments, Plaintiff returned to patrolling the West sector in the fall of 2002, where

he continued supervising other officers. (Id., at ¶ 5).

All Metro police officers must get approval for off-duty work, and the Plaintiff sought

and received Metro's approval to work as a security guard at the South Street and Bound'ry

restaurants prior to his deployment. (Id., at ¶ 6).

Plaintiff remained in the Army Reserve through 2003. (Id., at ¶ 7). In October of 2003,

the Army called Plaintiff at work to tell him that he "was being transferred to another unit to take

command as they were being mobilized" for service in Operation Iraqi Freedom. (Id., at ¶ 8).

Plaintiff told his lieutenant at Metro, Kim Dillingham, of his upcoming military leave the same

day that the Army informed him. (Id., at ¶ 9). The week after the Army contacted him, the

Plaintiff took his first trip to Chattanooga to begin preparations for deployment, and he stopped working at Metro altogether on November 30, 2003. (Id., at ¶ 10).

On January 2, 2004, the unit Plaintiff commanded had its official mobilization ceremony. (Plaintiff's Response To Defendant's Statement Of Undisputed Material Facts (Docket No. 40), at ¶ 2 (hereinafter "Plaintiff's Response to Facts")). The next day the unit left for Fort Stewart, Georgia. (Id.). The unit was in Fort Stewart until roughly February 20, when it was transferred to Camp Navistar/Big Sky Oasis in Kuwait. (Id.).

The Army assigned the Plaintiff to run the "mayor's cell" at Camp Navistar. (Defendant's Response to Facts, at ¶ 11). Plaintiff's unit ran the camp on a day-to-day basis – moving supplies; setting out bottled water for soldiers; handling any problems with housing, etc. (Plaintiff's Response to Facts, at ¶ 3). The job also required Plaintiff to empty and store contraband from "amnesty boxes." (Defendant's Response to Facts, at ¶ 11).

In June or July, 2004, Command Sergeant Thomas Seuberling conducted a health and welfare inspection of Plaintiff's quarters. (Plaintiff's Response to Facts, at ¶ 4). During the initial inspection, CSM Seuberling found a five-gallon jerry can (which looks like a gas can) that Plaintiff was using to manufacture homemade wine. (Id.) [1]

Plaintiff claims that he had alcohol in his tent because CSM Seuberling asked him to obtain alcohol. (Id., at ¶ 7). Specifically, Plaintiff claims that CSM Seuberling told him that he was negotiating with a Kuwaiti farmer to get him to cut down some trees that were blocking the

---

[1] Many of the statements made by Mr. Seuberling in his affidavit regarding this incident in Kuwait contradict the Plaintiff's testimony, and are disputed by the Plaintiff. As credibility determinations are inappropriate for summary judgment, and a factual finding as to the events that took place in Kuwait are unnecessary to the Court's decision, the Court does not rely on the disputed statements in Mr. Seuberling's affidavit.

3

camp's guard towers, and that the farmer would cut down the trees if he could get him some alcohol. (Id.; Defendant's Response to Facts, at ¶ 12).

Based upon CSM Seuberling's health and welfare inspection, and the resulting investigation, Plaintiff was charged with a violation of the Military Code of Justice. (Plaintiff's Response to Facts, at ¶ 10). Specifically, Plaintiff was charged with: (1) violation of a lawful order; and (2) conduct unbecoming an officer. (Id.) With regard to the first charge, Plaintiff was accused of violating U.S. Central command General Order 1A, in that he was in possession of, and manufactured, alcohol. (Id., at ¶ 11). By Plaintiff's own admission, he was in possession of, and was manufacturing, alcohol. (Id., at ¶ 12). Plaintiff testified in his deposition that his intent in manufacturing wine in his tent was "mainly" to use it as an incentive for the farmer to clear trees, but he acknowledged that he may have used the wine for his own consumption eventually. (Id., at ¶ 13). Plaintiff also admits receiving bottles of alcohol while in Kuwait, and using them for personal consumption. (Id., at ¶ 14).

With respect to the conduct unbecoming an officer charge, Plaintiff was accused of offering alcohol to enlisted soldiers. (Id., at ¶ 15). By Plaintiff's own admission, he gave alcohol to a female enlisted soldier, Sergeant Melanie Barnhart. (Id., at ¶ 16). Furthermore, by Plaintiff's own admission, he and Sergeant Barnhart drank together. (Id.) Plaintiff knew that giving alcohol to a soldier was a violation of General Order 1A. (Id., at ¶ 17). Nevertheless, Plaintiff gave alcohol to Sergeant Barnhart anyway, and he drank with her. (Id.)

In late 2004, Plaintiff appeared in front of a military judge, where he was arraigned. (Id., at ¶ 18). In lieu of going forward with court martial proceedings, Plaintiff submitted a request to resign his commission "for the good of the service." (Id., at ¶ 19). When Plaintiff submitted his

4

request to resign "for the good of the service," the Army relieved him of his command, meaning that he was relieved of his supervisory responsibilities.(Id.)  Plaintiff was notified on January 15, 2005 that his resignation "for the good of the service" had been approved. (Id., at ¶ 20).  The Army formally dismissed all charges against him in January 2005. (Defendant's Response To Facts, at ¶ 14).

When he left active duty, Plaintiff received two versions of his Department of Defense Form DD-214. (Id., at ¶ 21).  One focuses on awards, commendations, and service dates, but does not include the "character of service." (Id.) The other includes the character of service. (Id.)

Plaintiff's discharge was characterized as "under honorable conditions (general)." (Defendant's Response To Facts, at ¶ 16).  The Army returned Plaintiff to Fort Stewart, Georgia on or about February 1, 2005. (Id., at ¶ 15).

Plaintiff visited Metro to request reinstatement on February 28, 2005. (Id., at ¶ 17; Plaintiff's Response to Facts, at ¶ 22).  The Police Department has a return-to-work process for officers who have been away from the Police Department for an extended period of time. (Plaintiff's Response To Facts, at ¶ 23).  This return-to-work process applies to all officers who have been away from the Police Department for an extended period of time, regardless of the reason for their separation. (Id.)  The Police Department's return-to-work process includes a personal history update questionnaire, a medical examination, a computer voice stress analysis, a drug screening, and a debriefing with a Police Department psychologist. (Id., at ¶ 24; Defendant's Response To Facts, at ¶¶ 19-23)  In addition, the Police Department requests that returning officers execute a medical records authorization, and for individuals returning from

5

military duty, an authorization to obtain military records. (Id.)  The purpose of the Police Department's return-to-work process is to ensure that every individual entrusted with the responsibility of being a Metropolitan Police Officer is still physically, emotionally, and temperamentally qualified to be a police officer after having being absent from the Department. (Id., at ¶ 25).

One of the questions on the personal history questionnaire Plaintiff filled out during the return-to-work process asked: "During your absence were you arrested, charged, detained, or a suspect in any criminal action or military disciplinary action for any reason or do you have any action pending? If yes, explain in detail (use back if necessary)." (Id., at ¶ 49; Defendant's Response To Facts, at ¶ 18).  Plaintiff answered "Yes." (Id., at ¶ 50).  He also attached a narrative explanation of his response in which he admitted facing military charges in Kuwait. (Id., at ¶¶ 50-51).   The narrative description did not disclose: (1) that Plaintiff was accused of giving alcohol to an enlisted soldier; and (2) that Plaintiff was accused of manufacturing alcohol. (Id., at ¶ 51).

Plaintiff did not receive any salary or benefits for the period of examination between February 28, 2005 and March 21, 2005. (Id., at ¶ 25).

On March 21, 2005, Defendant returned the Plaintiff to work.  (Id., at ¶ 26).  Defendant did not, however, return the Plaintiff to his original position of patrol sergeant, or a substantially similar position.  (Id., at ¶ 27).  Plaintiff contends that he was assigned to an office job in which he primarily answered telephone calls from the public.  (Id., at ¶ 29).  Defendant states that Plaintiff has also taken police reports, which is a duty that must be performed by a sworn police officer.  (Id.).

6

The Metropolitan Police Department's Office of Professional Accountability ("OPA") serves the internal affairs function of the Metropolitan Police Department. (Plaintiff's Response to Facts, at ¶ 30). OPA initiated an investigation focused on whether Plaintiff was honest and truthful when he completed return-to-work paperwork after returning from military service. (Id., at ¶ 31).[2] The Police Department's "Disciplinary/Corrective Action Grid" indicates that the Department has a zero tolerance for dishonesty. (Plaintiff's Response to Facts, at ¶ 52).

On April 14, 2005, Metro issued a Notice of Complaint to Plaintiff outlining these charges. (Id., at ¶ 32; Defendant's Response to Facts, at ¶ 30). On May 10, 2005, Lieutenant Gordon Howey met with Plaintiff to discuss the charges against him. (Plaintiff's Response To Facts, at ¶ 33). Based upon the results of this meeting, Lieutenant Howey prepared a report concluding that the allegation that Plaintiff was not truthful when he completed return-to-work paperwork was unfounded. (Id.; Defendant's Response to Facts, at ¶ 31). Lieutenant Howey signed this report on May 17, 2005. (Id.; Plaintiff's Response To Facts, at ¶ 33) On May 31, 2005, Kennetha Sawyers, the Director of OPA, signed Lieutenant Howey's report. (Id., at ¶ 34). Chief of Police Ronal Serpas accepted Mr. Howey's conclusions, and the director of OPA, Kennetha Sawyers, closed the investigation into Plaintiff on July 22, 2005. (Defendant's Response to Facts, at ¶ 33). Additionally, on July 22, 2005, Ms. Sawyers sent Plaintiff a letter stating that OPA had completed its investigation and determined that the charges against him were unfounded. (Id.; Plaintiff's Response To Facts, at ¶ 34).

---

[2] Although the Defendant indicates the investigation followed a computer voice stress analysis of the Plaintiff that indicated deception, the Court does not consider the results of that analysis for purposes of the pending motion as Defendant has failed to file an affidavit describing that analysis or one authenticating the exhibit purporting to be the results of the analysis.

Also, on July 22, 2005, Metro informed Plaintiff that the Peace Officer Standards Training ("POST") Commission, which certifies Metro police officers, did not accept his discharge. (Defendant's Response To Facts, at ¶ 34). At that time, a Police Department employee named Calvin Hullett served as the POST Commission chairman. (Id., at ¶ 35). Metro "specifically" did not request a waiver for Plaintiff from the POST Commission. (Id., at ¶ 36).

After sending Plaintiff the July 22, 2005 letter, Ms. Sawyers states that she continued to be troubled by the disconnect between Plaintiff's description of the events leading to his discharge, and the severity of his punishment. (Plaintiff's Response to Facts, at ¶ 35). Accordingly, in mid-August Ms. Sawyers contacted a representative from the U.S. Army to request additional documents and information from Plaintiff's file. (Id., at ¶ 36). During this conversation, Ms. Sawyers discovered that the DD-214 Plaintiff submitted to the Metropolitan Government appeared to have been "altered." (Id.) Plaintiff contends that the difference between the official copy and the one he submitted to Metro does not constitute an "alteration." (Id.) Based upon this new information, Ms. Sawyers requested a copy of Plaintiff's DD-214 from the Tennessee Department of Veteran's Affairs. (Id., at ¶ 37).

On September 1, 2005, Georgia Norman, chief of War Records, sent OPA a copy of Plaintiff's DD-214 via facsimile. (Id., at ¶ 38). The form submitted by the Plaintiff to Metro omitted a few boxes at the bottom, including Box 28, which listed Plaintiff's "Narrative Reason for Separation" as "in lieu of trial by court martial." (Id., at ¶¶ 38,42). The form also omitted Blocks 29 and 30. (Id., at ¶ 42).

During his deposition testimony and in response to Defendant's requests for admission,

8

Plaintiff admitted that he did not provide a complete copy of his DD-214 to Metro. (Id., at ¶ 41). Each DD-214 contains the following language in the top right hand corner: "Any alterations in shaded areas render form void." (Id., at ¶ 43). Box 28 of the DD-214 is a shaded area. (Id.) During his deposition, Plaintiff testified that when he copied his DD-214, the copy was enlarged, which cut off Boxes 28, 29 and 30. (Id., at ¶ 45). He testified that he did not intentionally enlarge the form. (Id.) Later in the deposition, Plaintiff said he could not remember if he intentionally removed Boxes 28, 29 and 30. (Id., at ¶ 47). In his response to a Request for Admission, however, Plaintiff stated that he "caused [the] form to be enlarged on a copying machine thinking that the relevant portion of that document would be more readable to the Defendant." (Id., at ¶ 46; Exhibit 4 to Docket No. 32 ("Petty Responses to Metro Discovery")).

Metro contends that this new information received by Ms. Sawyers led to OPA's second investigation into Plaintiff's conduct, which focuses on whether Plaintiff intentionally altered the DD-214 he provided to the Metropolitan Government. (Id., at ¶ 39). Plaintiff contends that the actual reason for the second investigation was to retaliate against the Plaintiff for filing this lawsuit. (Id.) When Ms. Sawyers conducted the follow-up research that lead to OPA's second investigation of Plaintiff's conduct, Plaintiff had not filed a lawsuit, and Ms. Sawyers was not aware that he was contemplating filing a lawsuit. (Id., at ¶ 40). Plaintiff points out that Ms. Sawyers' research ended five days before he filed suit, on September 6, 2005, and that Ms. Sawyers knew about the lawsuit before Metro filed its second Notice of Complaint against the Plaintiff on October 21, 2005. (Id.; Defendant's Response To Facts, at ¶¶ 39, 40). Plaintiff told superiors that he was contemplating a lawsuit months before he filed it. (Id.)

Since approximately October 10, 2005, Defendant has assigned Plaintiff to the Central

9

Station "bubble," where he has continued answering telephone calls from the public. (Defendant's Response To Facts, at ¶ 37). Traditionally, Metro staffs the bubble with officers facing discipline or who are otherwise "disempowered." (Id., at ¶ 38).

On December 21, 2005, Plaintiff requested Metro's permission to return to his off-duty security jobs at South Street and Bound'ry. (Id., at ¶ 42). Metro denied Plaintiff's request for off-duty employment. (Id., at ¶ 43).

## III. Analysis

### A. The Standards for Considering Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003).

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of

that party's case upon which he will bear the burden of proof at trial. <u>Celotex Corp.</u>, 106 S.Ct. at 2553; <u>Meyers</u>, 341 F.3d at 466. To create a genuine factual issue, the nonmoving party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> <u>See</u> <u>also</u> <u>Hopson</u>, 306 F.3d at 432.

A preponderance of the evidence standard is used in this determination. <u>Id.</u> Therefore, if the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. <u>Id.</u> <u>See</u> <u>also</u> <u>Matsushita Electric,</u> 106 S.Ct. at 1356.

B. <u>USSERA</u>

Plaintiff alleges that the Defendant has violated USERRA in three distinct ways: (1) Defendant failed to promptly re-employ him in his original position or one of like status; (2) Defendant discriminated against Plaintiff on the basis of his military service; and (3) Defendant retaliated against the Plaintiff for enforcing his USERRA rights.

1. <u>Reemployment</u>

Plaintiff alleges that the Defendant violated USERRA by failing to promptly reemploy him, and by failing to return him to patrol work.

Section 4312 of USERRA describes the reemployment rights of those who serve in military service:

11

[A]ny person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if-

> (1) the person . . . has given advance written or verbal notice of such service to such person's employer;

> (2) the cumulative length of the absence . . . by reason of service in the uniformed services does not exceed five years; and

> (3) except as provided in subsection (f), the person reports to, or submits an application for reemployment to, such employer in accordance with the provisions of subsection (e).

Section 4313(a) provides that "a person entitled to reemployment under Section 4312, upon completion of a period of service in the uniformed services shall be promptly redeployed in a position of employment. . ." The regulations interpreting this statute provide that:

> 'Prompt reemployment' means as soon as practicable under the circumstances of each case. Absent unusual circumstances, reemployment must occur within two weeks of the employee's application for reemployment. For example, prompt reinstatement after a weekend National Guard duty generally means the next regularly scheduled working day. On the other hand, prompt reinstatement following several years of active duty may require more time, because the employer may have to reassign or give notice to another employee who occupied the returning employee's position.

20 C.F.R. § 1002.181.

Plaintiff stopped working for Metro to report for military service on November 30, 2003, and completed his service on or about February 1, 2005. Plaintiff applied for reemployment on February 28, 2005, and actually returned to work on March 21, 2005. Thus, Plaintiff returned to work approximately three weeks after application for reemployment.

Plaintiff argues that, based on the regulation cited above, the Defendant should have rehired him within two weeks after he applied for reinstatement, and that the delay of an extra week violates the statute's requirement that he be "promptly" redeployed.

12

Defendant argues that it redeployed the Plaintiff, in the words of the regulation, "as soon as practicable under the circumstances." Defendant points out that, as a police department, it is obligated to ensure that officers are physically and mentally capable of performing their duties. The Defendant specifically contends that the delay was caused by a need to investigate Plaintiff's statement on a return-to-work questionnaire that he was "arrested, charged, detained, or a suspect in any criminal action or military disciplinary action," and that he faced military charges in Kuwait. The Defendant also contends that a computer voice stress analysis of the Plaintiff indicated that he was being untruthful about the military charges against him.

Plaintiff counters that USERRA supersedes any department policy to determine if an officer is capable of performing his duties, and that any delay based on that policy is unreasonable.

As an initial matter, the Court concludes that Defendant did not violate USERRA by applying its return-to-work procedures to the Plaintiff. According to Deputy Chief Honey Pike, the return-to-work process is to "ensure that each and every individual entrusted with the responsibility of being a Metropolitan Police Officer is still physically, emotionally, and temperamentally qualified to be a police officer" after having been absent from the Department. (Affidavit of Chief Honey Pike, at ¶ 7)(attached to Docket No. 32)). Police officers carry weapons, are endowed with arresting and other authority by local governments, and are required to exercise sound judgment in volatile situations. Individuals who serve in the military are not exempt by virtue of USERRA from demonstrating that they still satisfy the qualifications to hold

Case 3:05-cv-00680 Document 49 Filed 11/16/06 Page 13 of 24 PageID #: 589

such a demanding position.[3]

In interpreting a predecessor statute to USERRA,[4] the Second Circuit recognized as much:

> The VRRA [the Veterans' Readjustment Assistance Act of 1974] should not be interpreted to forbid consideration of the same factors in determining whether the former employee is still qualified for employment. The statute is not intended to protect veterans' jobs in any and all circumstances; 'protection . . . is based upon the veteran's compliance with the reasonable and ordinarily accepted standards of personal conduct and performance of duty of all employees.' McCormick v. Carnett-Partsnett Sys., Inc., 396 F.Supp. 251, 256 (M.D.Fla.1975).

Preda v. Nissho Iwai American Corp., 128 F.3d 789, 792 (2nd Cir. 1997). See also Roll v. U.S. Postal Service, 78 Fed.Appx. 121, 123, 2003 WL 22344982 (Fed. Cir. Oct. 14, 2003)(Postal Service did not violate USERRA by requiring plaintiff to undergo background check and provide information regarding his discharge from military service "under honorable conditions.")

Furthermore, by stating that the employer is to re-employ a service person "as soon as

---

[3] Plaintiff cites 38 U.S.C. § 4302(b) to support his argument. That section provides:

> This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.

The qualifications applied to the Plaintiff do not constitute "additional prerequisites," however, as the same qualifications are applied to individuals who have not served in the military. (Pike Affidavit, at ¶ 5). This section does not permit an unqualified individual to return to a position simply because he has served in the military.

[4] The parties agree that in interpreting USERRA, courts may rely on the case law developed under the VRRA, a predecessor statute. Rogers v. City of San Antonio, 392 F.3d 758, 762 (5th Cir. 2004).

14

practicable under the circumstances of each case," Section 1002.181 provides the flexibility for application of such a return-to-work process to ensure that military service members are physically and mentally fit to resume their positions.

As for the three-week delay in reemploying the Plaintiff, the Court concludes that this period does not constitute a violation of the "prompt reemployment" requirement of the statute. Plaintiff's response to the return-to-work questionnaire that he had faced military charges while in Kuwait was an "unusual circumstance" making the two-week period set forth in the statute inapplicable.[5] In any event, three weeks is not an unreasonable amount of time for the Metropolitan Police Department to take in evaluating an individual who has been on active service and away from the Department for over a year. Accordingly, Plaintiff's "prompt reemployment" claim is without merit.

Next, Plaintiff contends that the Defendant should have assigned him to a patrol position upon his reemployment. Although Plaintiff makes this argument in connection with his "reemployment" claim, the Court concludes that it should be considered as part of his discrimination claim as Plaintiff admits he was reemployed, but claims he was not placed in a patrol position due to his military service.

2. <u>Discrimination</u>

Plaintiff argues that Defendant has discriminated against him by virtue of his military service because it denied him employment for three weeks, failed to return him to a patrol

---

[5] As noted above, Defendant also relies on a document purporting to be the results of a computer voice stress analysis allegedly indicating that the Plaintiff was untruthful in explaining the military charges against him. The Court does not rely on this evidence in reaching its decision, however, as Defendant has offered no supporting affidavit.

position, and denied him the privilege of engaging in part-time work.

Section 4311 of USERRA codifies the discrimination requirement as follows:

(a) A person who is a member of . . . has performed, . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any other benefit of employment by an employer on the basis of that membership, . . . performance of service. . .

* * *

(c) An employer shall be considered to have engaged in actions prohibited-

(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; . . .

In evaluating a discrimination claim under USERRA, the Sixth Circuit has explained that the plaintiff has the burden of showing that his military service was a motivating factor in the defendant's adverse employment decision:

Section 4311 is a congressional response to the Supreme Court's decision in Monroe v. Standard Oil Co., 452 U.S. 549, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981). In Monroe, the Supreme Court held that USERRA's antecedent, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 'was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely by* reserve status.' Id. at 559, 101 S.Ct. 2510 (emphasis added). Congress amended the statute in 1994 to provide that a violation occurs when a person's membership in the uniformed services is *a motivating factor,* even if not the sole factor. See Newport v. Ford Motor Co., 91 F.3d 1164, 1167 (8th Cir.1996) (noting that USERRA was enacted in response to Monroe and changed Monroe 's 'sole cause' standard to a 'motivating factor' standard). Stated otherwise, Congress intended to lessen, but not eliminate, a veteran's obligation to show that the employer's adverse decision was related to his or her service in the armed forces. *See* id.

16

Curby v. Archon, 216 F.3d 549, 556 -57 (6th Cir. 2000).

      The Eleventh Circuit has described the proof need to establish that military service was a

"motivating factor" for an employment action:

> A motivating factor does not mean that it had to be the sole cause of the
> employment action. Instead, 'it is one of the factors that "a truthful employer
> would list if asked for the reasons for its decision."' . . . 'Indeed, [m]ilitary status
> is a motivating factor if the defendant relied on, took into account, considered, or
> conditioned its decision on that consideration.' . . . Circumstantial evidence plays
> a critical part in these cases, 'for discrimination is seldom open or notorious.' . . .
> The court can infer discriminatory motivation under the USERRA from a variety
> of considerations, such as:
>
>> proximity in time between the employee's military activity and the
>> adverse employment action, inconsistencies between the proffered
>> reason and other actions of the employer, an employer's expressed
>> hostility towards members protected by the statute together with
>> knowledge of the employee's military activity, and disparate
>> treatment of certain employees compared to other employees with
>> similar work records or offenses.
>
> . . . 'When the employee has met this burden, the burden shifts to the employer to
> prove the affirmative defense that legitimate reasons, standing alone, would have
> induced the employer to take the same adverse action.' . . . This burden-shifting
> framework 'applies to both so-called "dual motive" cases and so-called "pretext"
> cases.' . . . 'Thus in USERRA actions there must be an initial showing by the
> employee that military status was at least a motivating or substantial factor in the
> agency action, upon which the agency must prove, by a preponderance of
> evidence, that the action would have been taken despite the protected status.'

Coffman v. Chugach Support Services, Inc., 411 F.3d 1231, 1238-39 (11th Cir. 2005)(citations

omitted).

      As discussed above, the Court concludes that there is no genuine factual issue suggesting

that the Plaintiff's military service was a motivating factor in the Defendant's decision to wait

three weeks before reemploying him.  On the contrary, the undisputed evidence in the record is

that the Plaintiff was required to undergo the same return-to-work process that those who had not

17

served in the military were required to undergo. (Affidavit of Chief Honey Pike, at ¶ 5 (attached to Docket No. 32)). Thus, Defendant has shown that it would have taken the same action in the absence of Plaintiff's military status. Accordingly, the Defendant is entitled to summary judgment on Plaintiff's discrimination claim regarding the delay in reemployment.

As for Defendant's failure to return Plaintiff to a patrol position, Defendant argues that it is warranted in taking this action, at least until OPA concludes its second investigation, because Plaintiff's dishonesty has disqualified him for such a position.[6]

Section 4313(a)(2) provides that for those whose period of service exceeded 90 days, the employer is to place him:

> (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service; or a position of like seniority, status and pay, the duties of which the person is qualified to perform; or

> (B) in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform, only if the person is not qualified to perform the duties of a position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.

38 U.S.C. § 4313(a)(2).[7] Section 4303(9) defines "qualified" as "having the ability to perform the essential tasks of the position." 38 U.S.C. § 4303(9).

---

[6] Plaintiff argues that Defendant waived lack of qualification as an affirmative defense. As stated in an accompanying order, this argument is without merit.

[7] Subsection (a)(4) indicates that an unqualified individual is to be placed in a position "which is the nearest approximation to" the positions described above "which such person is qualified to perform, with full seniority."

18

Defendant argues that honesty is one of the qualifications for being a patrol officer, citing the Police Department's zero tolerance for dishonesty.[8] Plaintiff counters that he is "qualified" within the meaning of the statute, and that the Defendant has not shown he was dishonest.

Before addressing the parties' arguments, it is important to precisely identify the question at issue. Based on the factual record submitted by the parties, Defendant has decided only that Plaintiff may not be placed in a patrol position during the pendency of the second investigation. That is the only decision ripe for review by this Court. As the record does not indicate that the Defendant has made a final decision regarding the Plaintiff's status, the Court cannot determine whether any final decision is discriminatory.

Plaintiff argues that under USERRA, he is unqualified for a position only if he has demonstrated "dangerous or extreme behavior," citing Lapine v. Town of Wellesley, 167 F.Supp.2d 132 (D. Mass. 2001), aff'd, 304 F.3d 90 (1st Cir. 2002). The district court in Lapine stated that "[t]he cases that have addressed the issue have consistently held that a veteran is unqualified only if he has demonstrated dangerous or extreme behavior." 167 F.Supp.2d at 139 (footnote omitted). The court then cites two cases in which the plaintiff veteran is held to be unqualified under USERRA based on behavior, such as threatening to kill fellow employees and threatening to ruin his employer. See Winfree v. Morrison, Inc., 762 F.Supp. 1310 (E.D. Tenn. 1990); Green v. Tho-Ro Products, Inc., 232 F.2d 172 (3rd Cir. 1956). The court also cited a case involving a plaintiff who "was often drunk at work," John S. Doane Co. v. Martin, 164 F.2d 537

_____

[8] Plaintiff argues that USERRA prevents the Defendant from applying its zero tolerance policy for dishonesty to him. As noted above, USERRA does not prevent an employer from applying the same qualifications to individuals who have served in the military as its applies to all other employees.

19

(1st Cir. 1947), and a case involving a plaintiff who "committed fraud on his employment application," <u>Greathouse v. The Babcock and Wilcox Co.</u>, 381 F.Supp. 156 (N.D. Ohio 1974).

This Court does is not persuaded that the <u>Lapine</u> court's restrictive definition of "qualified" under the provisions of USSERA is warranted. First, one of the cases cited by the <u>Lapine</u> court does not support its conclusion. As described by the court, the <u>Greathouse</u> case involved fraud on an employment application, which does not come to mind when one uses the terms "dangerous" or "extreme." Furthermore, this restrictive definition of "qualified" does not appear in the statute, and has not been used by other courts. <u>See</u> <u>Fullerton v. South King County Multi-Service Center, Inc.</u>, 72 F.3d 135 (9th Cir. 1995). Indeed, the First Circuit, on appeal in <u>Lupine</u>, does not repeat the district court's statement that extreme or dangerous behavior are the *only* conditions that disqualify a veteran. 304 F.3d at 104 ("Courts have held that a veteran is not qualified to return to his former position if he demonstrates extreme or dangerous behavior." )

USERRA defines "qualified" as having the ability to perform the essential tasks of the position, and because dishonesty is a basis for termination under Defendant's policies for *all* police officers, the Court concludes that honesty is essential for the position. Thus, Defendant may apply this qualification to the Plaintiff.

Plaintiff alternatively argues that Defendant has not shown he was dishonest. As noted above, however, the Court need not decide that question. The precise issue before the Court is whether Defendant is warranted in investigating the Plaintiff's conduct, and in refusing to place him in a patrol position during the pendency of that investigation.

The undisputed facts indicate that Plaintiff failed to submit the portion of the DD-214 stating the narrative reason for his separation. Based on that conduct, the Defendant was

20

warranted in conducting an investigation into the Plaintiff's honesty. As honesty is essential under departmental policy for a patrol officer, as discussed above, the Court concludes that Defendant was justified in refusing to place Plaintiff into a patrol position until the completion of the second investigation.

Although Plaintiff argues that the Defendant's decision was motivated by his status as a veteran, there is no evidence in this record that Plaintiff was treated differently than non-veteran return-to-work applicants who have failed to provide complete paperwork about past charges, or similar conduct. There is also no evidence that Defendant expressed any hostility to the Plaintiff because he was a veteran, or that it treated veterans less favorably than other return-to-work applicants. That the alleged dishonesty in this case was about events that occurred while in military service does not exempt the Plaintiff from inquiry into whether he satisfied the requirement that he be truthful with his employer. The Court concludes that Defendant is entitled to summary judgment on Plaintiff's discrimination claim regarding his non-patrol status during the pendency of the second investigation.

Finally, Plaintiff argues that Defendant's refusal to approve his request for off-duty work was discriminating. The parties have failed to address, however, the factors to be used under departmental policy in considering such a request, and the basis for Defendant's decision to refuse Plaintiff's request. Under these circumstances, the Court concludes that neither party is entitled to summary judgment on this claim.

3. Retaliation

Finally, Plaintiff argues that the Defendant retaliated against him for exercising his USERRA rights by launching the second investigation into his alleged dishonesty.

21

Section 4311(b) provides, in pertinent part, as follows:

An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter; (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter; (3) has assisted or otherwise participated in an investigation under this chapter; or (4) has exercised a right provided for in this chapter. . .

In order to succeed on this claim, Plaintiff must show that his exercise of USERRA rights was "a motivating factor in [the Defendant's] action, unless [the Defendant] can prove that the action would have been taken in the absence of [Plaintiff's USERRA complaints]." 38 U.S.C. § 4311(c)(2); Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006).

Plaintiff contends Defendant initiated its second investigation of his honesty in retaliation for his having made known to his superiors that he intended to file a lawsuit. Plaintiff relies heavily on the timing of the events involved – he filed suit on September 6, 2005, and Defendant issued its Notice of Complaint for the second investigation on October 21, 2005.[9]

The undisputed facts indicate, however, that Ms. Sawyers, the OPA Director, contacted the U.S. Army in mid-August, 2005 seeking additional documents from Plaintiff's file and learned that the DD-214 form submitted by Plaintiff appeared to have been altered. Ms. Sawyers received a copy of the DD-214 form on September 1, 2005. The second investigation was based

---

[9] Plaintiff cites Brandsasse v. City of Suffolk, Va., 72 F.Supp.2d 608, 619 (E.D. Va. 1999) for the proposition that an investigation of the plaintiff constitutes an adverse employment action under the statute. The Court assumes, and Defendant does not dispute, that the second investigation in this case constitutes an adverse employment action.

22

on the alleged "alteration" of this form.[10]  Although the Plaintiff indicates that he had told his superiors that he was contemplating a lawsuit before he filed suit on September 6, 2006, Ms. Sawyers' affidavit states that she was not aware Plaintiff was contemplating a lawsuit when she conducted the research leading to the second investigation.  Plaintiff has offered no proof contradicting this statement.

Although Plaintiff argues that Deputy Chief of Police Pike may have had a role in pursuing the second investigation, he offers no evidence that Pike knew of the Plaintiff's lawsuit before any participation in that investigation, and certainly, no evidence that Pike's actions were motivated by the lawsuit.

Other than the timing of the events in question, Plaintiff has offered no evidence suggesting that Plaintiff's contemplation and actual filing of a lawsuit was a motivating factor in the Defendant's decision to open a second investigation into Plaintiff's honesty based on the alleged alteration of the DD-214 form.[11] See Francis, 452 F.3d at 309 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.")

---

[10]  Plaintiff argues that the second investigation was simply a "repackaging" of the first investigation.  The undisputed evidence indicates, however, that the first investigation was based on whether Plaintiff was honest and truthful when he completed the return-to-work paperwork, growing out of  and the second investigation focused on whether the DD-214 form submitted by the Plaintiff had been "altered."

[11]  Plaintiff has offered no evidence supporting his suggestion that the retaliatory action was simply the issuance of the official Notice of Complaint, which occurred after the lawsuit was filed.  In other words, Plaintiff has offered no proof that, in the absence of retaliation, the normal course of events would have been for the Defendant to halt its investigation into the DD-214 before officially opening the investigation.

23

Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

IV.  <u>Conclusion</u>

For the reasons set forth herein, the Defendant's Cross-Motion for Summary Judgment is granted in part, and denied in part, and the Plaintiff's Motion For Summary Judgment is denied.

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE

Case 3:05-cv-00680   Document 49   Filed 11/16/06   Page 24 of 24 PageID #: 600