UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRIAN PETTY                              )
                                         )
v.                                       )     No. 3:05-0680
                                         )     JUDGE CAMPBELL
METROPOLITAN GOVERNMENT OF               )
NASHVILLE-DAVIDSON                       )

MEMORANDUM

I. Introduction

Pending before the Court are Defendant's Motion For Partial Summary Judgment (Docket No. 111), and Plaintiff's Motion for Summary Judgment (Docket No. 114). The Court held a hearing on the Motions on February 25, 2010. For the reasons stated on the record at the hearing, as supplemented herein, the Defendant's Motion For Partial Summary Judgment is GRANTED in part, and DENIED in part, and the Plaintiff's Motion For Summary Judgment is GRANTED in part, and DENIED in part.

As directed by the Sixth Circuit, the Court enters summary judgment in favor of the Plaintiff on the reemployment claims, and the Defendant is directed to reinstate the Plaintiff to the position he held prior to his absence for military service: patrol sergeant. Defendant is also directed to convey truthful and complete information to the Peace Officer Standards and Training Commission ("POST Commission") regarding Plaintiff's reemployment status. As resolution of the discrimination claim relating to off-duty work involves genuine issues of material fact, summary judgment is denied, and that claim and any damage issues remain for trial. At trial, the Court will also determine the appropriate amount of damages on Plaintiff's reemployment claims, as well as Plaintiff's claim for liquidated damages. Plaintiff concedes that

his claim based on 42 U.S.C. § 1983 has been dismissed. Plaintiff's retaliation and discrimination claims based on his termination are dismissed as moot in light of his reinstatement.

## II. Factual and Procedural Background

Plaintiff Brian Petty brought this action against Defendant Metropolitan Government Of Nashville and Davidson County, Tennessee, alleging that the Metropolitan Police Department violated the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4334, by failing to reemploy him in accordance with the Act after his return from active duty with the United States Army. (Amended Complaint (Docket No. 15)).

This Court initially granted summary judgment to the Defendant on the following claims: (1) failure to promptly reemploy the Plaintiff; (2) failure to return Plaintiff to a patrol position during the pendency of the second investigation; and (3) retaliation. (Docket No. 49). The Court denied summary judgment on Plaintiff's discrimination claim regarding refusal to approve off-duty work, and held a bench trial on that claim. (Id.; Docket No. 76). After hearing proof on Plaintiff's claim, the Court granted the Defendant's motion for judgment as a matter of law on the remaining claim. (Docket No. 76).

On appeal, the Sixth Court reversed the Court's grant of summary judgment and ordered that summary judgment be entered in favor of the Plaintiff on his claim that Defendant failed to reemploy him promptly and properly, with instructions to determine Plaintiff's damages. (Docket No. 83; Petty v. Metropolitan Government of Nashville-Davidson County, 538 F.3d 431, 448 (6th Cir. 2008) ("We REMAND this matter to the district court with instructions to

enter summary judgment in favor of Petty on the reemployment claims and to determine the resultant damages. . . "). The court also vacated this Court's entry of judgment as a matter of law on the discriminatory refusal to permit off-duty work claim, and remanded the claim to this Court "to conduct further proceedings not inconsistent with this opinion." (Id., at 15).

After the Sixth Circuit's opinion was issued, the Plaintiff filed a Supplemental Complaint (Docket No. 89), which included the following claims: (1) the Defendant discriminated against him in violation of USERRA by failing to reemploy him to the same status and position, by terminating his employment, and by requesting his decertification by the POST Commission (Count 1); (2) the Defendant retaliated against him in violation of USERRA for filing this lawsuit by failing to reemploy him to the same status and position, by preventing him from sitting for the lieutenant's exam, by terminating his employment, and by requesting his decertification by the POST Commission (Count 2); (3) the Defendant has deprived him of the benefits of USERRA and section 4.12(C) of the Metropolitan Code under color of law (Count 3); and (4) the Court should resolve a dispute between the parties regarding the authority and obligations under USERRA in relation to sections 7.7 and 4.12(C) of the Metropolitan Code. (Docket No. 89).

In its opinion, the Sixth Circuit recited the facts set forth by this Court in the first summary judgment decision:

> The parties agree to the following facts: Plaintiff joined the Army National guard in 1986 and opted into the Army Reserve with the Army National Guard as his 'reserve component' in 1989. (Defendant's Response To Plaintiff's Statement of Undisputed Material Facts, at ¶ 1 (Docket No. 32)(hereinafter 'Defendant's Response To Facts')). The Defendant hired the Plaintiff as a police officer on February 1, 1991. (Id., at ¶ 2). In 1993, Metro assigned the Plaintiff to patrol the West sector of Nashville, where Plaintiff focused on crime prevention in housing projects. (Id., at ¶ 3). Metro promoted the Plaintiff to the rank of sergeant in

3

January, 2000, whereupon he started supervising other officers in the South sector. (Id., at ¶ 4). After various reassignments, Plaintiff returned to patrolling the West sector in the fall of 2002, where he continued supervising other officers. (Id., at ¶ 5).

All Metro police officers must get approval for off-duty work, and the Plaintiff sought and received Metro's approval to work as a security guard at the South Street and Bound'ry restaurants prior to his deployment. (Id., at ¶ 6).

Plaintiff remained in the Army Reserve through 2003. (Id., at ¶ 7). In October of 2003, the Army called Plaintiff at work to tell him that he 'was being transferred to another unit to take command as they were being mobilized' for service in Operation Iraqi Freedom. (Id., at ¶ 8). Plaintiff told his lieutenant at Metro, Kim Dillingham, of his upcoming military leave the same day that the Army informed him. (Id., at ¶ 9). The week after the Army contacted him, the Plaintiff took his first trip to Chattanooga to begin preparations for deployment, and he stopped working at Metro altogether on November 30, 2003. (Id., at ¶ 10).

On January 2, 2004, the unit Plaintiff commanded had its official mobilization ceremony. (Plaintiff's Response To Defendant's Statement Of Undisputed Material Facts (Docket No. 40), at ¶ 2 (hereinafter 'Plaintiff's Response to Facts')). The next day the unit left for Fort Stewart, Georgia. (Id.). The unit was in Fort Stewart until roughly February 20, when it was transferred to Camp Navistar/Big Sky Oasis in Kuwait. (Id.).

The Army assigned the Plaintiff to run the 'mayor's cell' at Camp Navistar. (Defendant's Response to Facts, at ¶ 11). Plaintiff's unit ran the camp on a day-to-day basis – moving supplies; setting out bottled water for soldiers; handling any problems with housing, etc. (Plaintiff's Response to Facts, at ¶ 3). The job also required Plaintiff to empty and store contraband from 'amnesty boxes.' (Defendant's Response to Facts, at ¶ 11).

In June or July, 2004, Command Sergeant Thomas Seuberling conducted a health and welfare inspection of Plaintiff's quarters. (Plaintiff's Response to Facts, at ¶ 4). During the initial inspection, CSM Seuberling found a five-gallon jerry can (which looks like a gas can) that Plaintiff was using to manufacture homemade wine. (Id.) FN 1

> FN 1 Many of the statements made by Mr. Seuberling in his affidavit regarding this incident in Kuwait contradict the Plaintiff's testimony, and are disputed by the Plaintiff. As credibility determinations are inappropriate for summary judgment, and a factual finding as to the events that took place in Kuwait are unnecessary to the Court's decision, the Court does not rely on the

4

disputed statements in Mr. Seuberling's affidavit.

Plaintiff claims that he had alcohol in his tent because CSM Seuberling asked him to obtain alcohol. (Id., at ¶ 7). Specifically, Plaintiff claims that CSM Seuberling told him that he was negotiating with a Kuwaiti farmer to get him to cut down some trees that were blocking the camp's guard towers, and that the farmer would cut down the trees if he could get him some alcohol. (Id.; Defendant's Response to Facts, at ¶ 12).

Based upon CSM Seuberling's health and welfare inspection, and the resulting investigation, Plaintiff was charged with a violation of the Military Code of Justice. (Plaintiff's Response to Facts, at ¶ 10). Specifically, Plaintiff was charged with: (1) violation of a lawful order; and (2) conduct unbecoming an officer. (Id.) With regard to the first charge, Plaintiff was accused of violating U.S. Central command General Order 1A, in that he was in possession of, and manufactured, alcohol. (Id., at ¶ 11). By Plaintiff's own admission, he was in possession of, and was manufacturing, alcohol. (Id., at ¶ 12). Plaintiff testified in his deposition that his intent in manufacturing wine in his tent was 'mainly' to use it as an incentive for the farmer to clear trees, but he acknowledged that he may have used the wine for his own consumption eventually. (Id., at ¶ 13). Plaintiff also admits receiving bottles of alcohol while in Kuwait, and using them for personal consumption. (Id., at ¶ 14).

With respect to the conduct unbecoming an officer charge, Plaintiff was accused of offering alcohol to enlisted soldiers. (Id., at ¶ 15). By Plaintiff's own admission, he gave alcohol to a female enlisted soldier, Sergeant Melanie Barnhart. (Id., at ¶ 16). Furthermore, by Plaintiff's own admission, he and Sergeant Barnhart drank together. (Id.) Plaintiff knew that giving alcohol to a soldier was a violation of General Order 1A. (Id., at ¶ 17). Nevertheless, Plaintiff gave alcohol to Sergeant Barnhart anyway, and he drank with her. (Id.)

In late 2004, Plaintiff appeared in front of a military judge, where he was arraigned. (Id., at ¶ 18). In lieu of going forward with court martial proceedings, Plaintiff submitted a request to resign his commission 'for the good of the service.' (Id., at ¶ 19). When Plaintiff submitted his request to resign 'for the good of the service,' the Army relieved him of his command, meaning that he was relieved of his supervisory responsibilities.(Id.) Plaintiff was notified on January 15, 2005 that his resignation 'for the good of the service' had been approved. (Id., at ¶ 20). The Army formally dismissed all charges against him in January 2005. (Defendant's Response To Facts, at ¶ 14).

When he left active duty, Plaintiff received two versions of his Department of Defense Form DD-214. (Id., at ¶ 21). One focuses on awards, commendations, and service dates, but does not include the 'character of service.' (Id.) The other

includes the character of service. (Id.)

Plaintiff's discharge was characterized as 'under honorable conditions (general).' (Defendant's Response To Facts, at ¶ 16). The Army returned Plaintiff to Fort Stewart, Georgia on or about February 1, 2005. (Id., at ¶ 15).

Plaintiff visited Metro to request reinstatement on February 28, 2005. (Id., at ¶ 17; Plaintiff's Response to Facts, at ¶ 22). The Police Department has a return-to-work process for officers who have been away from the Police Department for an extended period of time. (Plaintiff's Response To Facts, at ¶ 23). This return-to-work process applies to all officers who have been away from the Police Department for an extended period of time, regardless of the reason for their separation. (Id.) The Police Department's return-to-work process includes a personal history update questionnaire, a medical examination, a computer voice stress analysis, a drug screening, and a debriefing with a Police Department psychologist. (Id., at ¶ 24; Defendant's Response To Facts, at ¶¶ 19-23). In addition, the Police Department requests that returning officers execute a medical records authorization, and for individuals returning from military duty, an authorization to obtain military records. (Id.) The purpose of the Police Department's return-to-work process is to ensure that every individual entrusted with the responsibility of being a Metropolitan Police Officer is still physically, emotionally, and temperamentally qualified to be a police officer after having being absent from the Department. (Id., at ¶ 25).

One of the questions on the personal history questionnaire Plaintiff filled out during the return-to-work process asked: 'During your absence were you arrested, charged, detained, or a suspect in any criminal action or military disciplinary action for any reason or do you have any action pending? If yes, explain in detail (use back if necessary).' (Id., at ¶ 49; Defendant's Response To Facts, at ¶ 18). Plaintiff answered 'Yes.' (Id., at ¶ 50). He also attached a narrative explanation of his response in which he admitted facing military charges in Kuwait. (Id., at ¶¶ 50-51). The narrative description did not disclose: (1) that Plaintiff was accused of giving alcohol to an enlisted soldier; and (2) that Plaintiff was accused of manufacturing alcohol. (Id., at ¶ 51).

Plaintiff did not receive any salary or benefits for the period of examination between February 28, 2005 and March 21, 2005. (Id., at ¶ 25).

On March 21, 2005, Defendant returned the Plaintiff to work. (Id., at ¶ 26). Defendant did not, however, return the Plaintiff to his original position of patrol sergeant, or a substantially similar position. (Id., at ¶ 27). Plaintiff contends that he was assigned to an office job in which he primarily answered telephone calls from the public. (Id., at ¶ 29). Defendant states that Plaintiff has also taken police reports, which is a duty that must be performed by a sworn police officer.

6

(Id.).

The Metropolitan Police Department's Office of Professional Accountability ('OPA') serves the internal affairs function of the Metropolitan Police Department. (Plaintiff's Response to Facts, at ¶ 30). OPA initiated an investigation focused on whether Plaintiff was honest and truthful when he completed return-to-work paperwork after returning from military service. (Id., at ¶ 31). FN 2 The Police Department's 'Disciplinary/Corrective Action Grid' indicates that the Department has a zero tolerance for dishonesty. (Plaintiff's Response to Facts, at ¶ 52).

> FN 2 Many of the statements made by Mr. Seuberling in his affidavit regarding this incident in Kuwait contradict the Plaintiff's testimony, and are disputed by the Plaintiff. As credibility determinations are inappropriate for summary judgment, and a factual finding as to the events that took place in Kuwait are unnecessary to the Court's decision, the Court does not rely on the disputed statements in Mr. Seuberling's affidavit.

On April 14, 2005, Metro issued a Notice of Complaint to Plaintiff outlining these charges. (Id., at ¶ 32; Defendant's Response to Facts, at ¶ 30). On May 10, 2005, Lieutenant Gordon Howey met with Plaintiff to discuss the charges against him. (Plaintiff's Response To Facts, at ¶ 33). Based upon the results of this meeting, Lieutenant Howey prepared a report concluding that the allegation that Plaintiff was not truthful when he completed return-to-work paperwork was unfounded. (Id.; Defendant's Response to Facts, at ¶ 31). Lieutenant Howey signed this report on May 17, 2005. (Id.; Plaintiff's Response To Facts, at ¶ 33) On May 31, 2005, Kennetha Sawyers, the Director of OPA, signed Lieutenant Howey's report. (Id., at ¶ 34). Chief of Police Ronal Serpas accepted Mr. Howey's conclusions, and the director of OPA, Kennetha Sawyers, closed the investigation into Plaintiff on July 22, 2005. (Defendant's Response to Facts, at ¶ 33). Additionally, on July 22, 2005, Ms. Sawyers sent Plaintiff a letter stating that OPA had completed its investigation and determined that the charges against him were unfounded. (Id.; Plaintiff's Response To Facts, at ¶ 34).

Also, on July 22, 2005, Metro informed Plaintiff that the Peace Officer Standards Training ('POST') Commission, which certifies Metro police officers, did not accept his discharge. (Defendant's Response To Facts, at ¶ 34). At that time, a Police Department employee named Calvin Hullett served as the POST Commission chairman. (Id., at ¶ 35). Metro 'specifically' did not request a waiver for Plaintiff from the POST Commission. (Id., at ¶ 36).

After sending Plaintiff the July 22, 2005 letter, Ms. Sawyers states that she continued to be troubled by the disconnect between Plaintiff's description of the

7

events leading to his discharge, and the severity of his punishment. (Plaintiff's Response to Facts, at ¶ 35). Accordingly, in mid-August Ms. Sawyers contacted a representative from the U.S. Army to request additional documents and information from Plaintiff's file. (Id., at ¶ 36). During this conversation, Ms. Sawyers discovered that the DD-214 Plaintiff submitted to the Metropolitan Government appeared to have been 'altered.' (Id.) Plaintiff contends that the difference between the official copy and the one he submitted to Metro does not constitute an 'alteration.' (Id.) Based upon this new information, Ms. Sawyers requested a copy of Plaintiff's DD-214 from the Tennessee Department of Veteran's Affairs. (Id., at ¶ 37).

On September 1, 2005, Georgia Norman, chief of War Records, sent OPA a copy of Plaintiff's DD-214 via facsimile. (Id., at ¶ 38). The form submitted by the Plaintiff to Metro omitted a few boxes at the bottom, including Box 28, which listed Plaintiff's 'Narrative Reason for Separation' as 'in lieu of trial by court martial.' (Id., at ¶¶ 38,42). The form also omitted Blocks 29 and 30. (Id., at ¶ 42).

During his deposition testimony and in response to Defendant's requests for admission, Plaintiff admitted that he did not provide a complete copy of his DD-214 to Metro. (Id., at ¶ 41). Each DD-214 contains the following language in the top right hand corner: 'Any alterations in shaded areas render form void.' (Id., at ¶ 43). Box 28 of the DD-214 is a shaded area. (Id.) During his deposition, Plaintiff testified that when he copied his DD-214, the copy was enlarged, which cut off Boxes 28, 29 and 30. (Id., at ¶ 45). He testified that he did not intentionally enlarge the form. (Id.) Later in the deposition, Plaintiff said he could not remember if he intentionally removed Boxes 28, 29 and 30. (Id., at ¶ 47). In his response to a Request for Admission, however, Plaintiff stated that he 'caused [the] form to be enlarged on a copying machine thinking that the relevant portion of that document would be more readable to the Defendant.' (Id., at ¶ 46; Exhibit 4 to Docket No. 32 ('Petty Responses to Metro Discovery')).

Metro contends that this new information received by Ms. Sawyers led to OPA's second investigation into Plaintiff's conduct, which focuses on whether Plaintiff intentionally altered the DD-214 he provided to the Metropolitan Government. (Id., at ¶ 39). Plaintiff contends that the actual reason for the second investigation was to retaliate against the Plaintiff for filing this lawsuit. (Id.) When Ms. Sawyers conducted the follow-up research that lead to OPA's second investigation of Plaintiff's conduct, Plaintiff had not filed a lawsuit, and Ms. Sawyers was not aware that he was contemplating filing a lawsuit. (Id., at ¶ 40). Plaintiff points out that Ms. Sawyers' research ended five days before he filed suit, on September 6, 2005, and that Ms. Sawyers knew about the lawsuit before Metro filed its second Notice of Complaint against the Plaintiff on October 21, 2005. (Id.; Defendant's Response To Facts, at ¶¶ 39, 40). Plaintiff told superiors that he was contemplating a lawsuit months before he filed it. (Id.)

8

> Since approximately October 10, 2005, Defendant has assigned Plaintiff to the Central Station 'bubble,' where he has continued answering telephone calls from the public. (Defendant's Response To Facts, at ¶ 37). Traditionally, Metro staffs the bubble with officers facing discipline or who are otherwise 'disempowered.' (Id., at ¶ 38).
>
> On December 21, 2005, Plaintiff requested Metro's permission to return to his off-duty security jobs at South Street and Bound'ry. (Id., at ¶ 42). Metro denied Plaintiff's request for off-duty employment. (Id., at ¶ 43).

(Docket No. 83, at 2-5; 538 F.3d at 434-38).

Since the Court issued its prior judgment, the Defendant terminated the Plaintiff on December 7, 2007 (while the case was on appeal). (Docket No. 120, at 8 of 28). After Metro notified the POST Commission of Plaintiff's termination, the Commission suspended Plaintiff's certification to be a police officer in Tennessee. (Id.)

### III. Analysis

A. The Standards for Considering Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. Hamilton v. General Electric Co., 556 F.3d 428, 433 (6th Cir. 2009); Van Gorder v. Grand Trunk Western Railroad, Inc., 509 F.3d 265, 268 (6th Cir. 2007).

In order to defeat a summary judgment motion, the nonmoving party must provide more than a scintilla of evidence; that is, the nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor. Van Gorder, 509 F.3d at 268. Entry of summary

9

judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial. Id.

B. USERRA

In his Motion, Plaintiff argues that the Court should order immediate relief, including reinstatement to the position he held prior to his military service, based on the Sixth Circuit's decision on the reemployment claims. Defendant argues that the Sixth Circuit's opinion does not require reinstatement, and that Plaintiff's termination should be analyzed under Section 4316(c) of USERRA.[1]

In its opinion, the Sixth Circuit explained that once Plaintiff complied with the four reemployment requirements of USERRA,[2] the Defendant was not permitted to require any other documentation or actions as a prerequisite to reemployment. Therefore, any dishonesty issues arising out of Defendant's return-to-work process, according to the court, did not provide a legitimate basis for failing to reemploy the Plaintiff in his previous position:

> At the point at which Petty was entitled to reemployment under §§ 4312 and 4313, Metro had no basis on which to question his qualifications. Petty had satisfied the only prerequisites to § 4313 – those specified in § 4312 – and Metro's attempt to impose additional prerequisites through its return-to-work

---

[1] 38 U.S.C. § 4316(c) provides: "A person who is reemployed by an employer under this chapter shall not be discharged from such employment, except for cause – (1) within one year after the date of such reemployment, if the person's period of service before the reemployment was more than 180 days . . . "

[2] The court listed those requirements as: (1) notification to the employer prior to departure for military service (38 U.S.C. § 4312(a)(1)); (2) the cumulative length of military service is less than five years (38 U.S.C. § 4312(a)(3)); (3) upon return, employee is required to request reemployment within the time frame outlined in 38 U.S.C. § 4312(e), and with the documentation specified in Section 4312(f). Petty, 538 F.3d at 440.

process was, as we have already explained, wholly impermissible. See 38 U.S.C.
§ 4302(b) (USERRA supersedes local policies). The process, then, including
Petty's alleged 'dishonesty' therein, cannot serve as a basis for delaying or
otherwise limiting Petty's right to reemployment. FN6

> FN6 It may be that dishonesty regarding military service and
> discharge on the part of a returning veteran would suffice to
> establish cause for termination under § 4316. However, such a
> conclusion is not obvious and it is not necessary for disposition of
> this case; we therefore express no opinion on this matter.

* * *

> . . . Metro has wholly failed to carry its burden of proving Petty's disqualification
> and has therefore clearly violated § 4313.

Petty, 538 F.3d at 443-44 (footnote omitted).

It is undisputed that while the Defendant reemployed the Plaintiff, it did not return him to the position he held prior to his military service. Also, there is no genuine dispute that the charges underlying Plaintiff's termination all relate to Plaintiff's failure to provide honest and complete answers to questions, as well as complete documentation, regarding his military service. (Memorandum from Chief Ronal W. Serpas to Sergeant Brian Petty, dated November 15, 2007 (Docket No. 115-3, at 18 of 25); Memorandum from Deputy Chief Steve Anderson to Sergeant Brian Petty, dated December 7, 2007 (Docket No. 118-7, at 40 of 44)). Therefore, the Court concludes that the Sixth Circuit's opinion mandates reinstatement of the Plaintiff to his prior position: patrol sergeant.[3]

---

[3] Although in its earlier decision, this Court expressed concern about ensuring that a police officer is physically and mentally fit before returning to work, the Sixth Circuit has rejected that concern:

> It is of no consequence here that Metro believes it is obligated to 'ensure that each
> and every individual entrusted with the responsibility of being a Metropolitan
> Police Officer is still physically, emotionally, and temperamentally qualified to be

11

The Defendant argues that language in the appeals court opinion supports its view that it was entitled to terminate the Plaintiff without restoring him to his previous position as long as it shows "cause" unrelated to Defendant's military service under Sections 4316(c) and 4311. The Defendant points to footnote 7 of the court's opinion: "At oral argument the parties indicated that Petty is no longer employed at Metro. This may limit the type of relief available to Petty on remand (e.g., placing Petty in the position of patrol sergeant may not be possible at this time); however, we leave these issues for the district court to determine." 538 F.3d at 444 n. 7.

Although it is not entirely clear, the Court does not construe footnote 7 as broadly as the Defendant when read in light of the entire opinion. The appeals court simply could have meant that reinstatement may no longer be possible after Plaintiff's termination because the Plaintiff may have secured other employment and no longer desires reinstatement. The court may have even contemplated that recent conduct on the part of the Plaintiff of which it was unaware could limit the possibility of reinstatement. The Court does not read this footnote, however, as permitting the Defendant to prevent reinstatement of the Plaintiff for "honesty" issues initially arising out of the return-to-work process given the court's clear rejection of those grounds earlier in its opinion: "We conclude that it would be inconsistent with the goals of USERRA to prevent Petty from exercising his right to reemployment because he failed to provide forthrightly information that is statutorily unnecessary to his establishing the right in the first place." 538 F.3d at 441.

---

a police officer after having been absent from the Department.' In USERRA, Congress clearly expressed its view that a returning veteran's reemployment rights take precedence over such concerns.

Petty, 538 F.3d at 441.

12

As directed by the Sixth Circuit, the Court enters summary judgment in favor of the Plaintiff on the reemployment claims, and the Defendant is directed to reinstate the Plaintiff to the position he held prior to his absence for military service: patrol sergeant. Defendant is also directed to convey truthful and complete information to the POST Commission regarding Plaintiff's reemployment status. Plaintiff's retaliation and discrimination claims based on his termination are dismissed as moot in light of his reinstatement.

As for other requests for relief based on the reemployment claims, there exist genuine issues of material fact regarding the appropriate amount of back pay and other relief. Therefore, summary judgment is denied on this issue, and the Court will determine damages for this violation of USERRA at trial. The Court will also consider Plaintiff's liquidated damages claim at trial. Plaintiff's request for attorneys' fees should be filed in accordance with Local Rule 54.01(b).

As for the discrimination claim relating to off-duty work, the Court concludes that genuine issues of material fact exist as to Defendant's motivation for denying Plaintiff's request for this benefit. Therefore, summary judgment is denied, and this claim and any damages issues remain for trial.

Finally, Defendant argues the Section 1983 claim raised in Plaintiff's Supplemental Complaint has already been dismissed by the Court. Plaintiff responds that he did not intend to renew his Section 1983 claim upon remand. Thus, the Court concludes that the Defendant should be awarded summary judgment on Plaintiff's Section 1983 claim.

### IV. Conclusion

For the reasons set forth above, Defendant's Motion For Partial Summary Judgment is

granted in part, and denied in part; and Plaintiff's Motion For Summary Judgment is granted in part, and denied in part.

      IT IS SO ORDERED.

                                                                            _____
                                                                            TODD J. CAMPBELL
                                                                            UNITED STATES DISTRICT JUDGE